# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| CADDO NATION OF OKLAHOMA | ) |
| --- | --- |
| Plaintiff, | ) |
| vs. | ) NO. CIV-16-0559-HE |
| WICHITA AND AFFILIATED TRIBES, ET AL., | ) |
| Defendants. | ) |

## ORDER

Plaintiff Caddo Nation of Oklahoma ("Caddo Nation") filed this action against defendants Wichita and Affiliated Tribes ("Wichita Tribe), Terri Parton, President of the Wichita Tribe, and other elected officials of the Wichita Tribe, seeking declaratory and injunctive relief. Plaintiff's claims are based on its concerns that defendant is building a history center on a site that Caddo elders believe may hold the remains of Caddo ancestors and cultural artifacts. Plaintiff asserts the land on which the center is being built is held jointly in trust by the United States for the Caddo Nation, the Wichita Tribe and the Delaware Nation. It contends defendants have violated the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*; and the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 302101 *et seq.*[1]

---

[1] *Federal courts generally review claims that an agency has violated NEPA and NHPA under the APA. See* All. for the Wild Rockies v. Angelita Bulletts, *2016 WL 1734086, at \*3 (D. Utah April 29, 2016) ("Because neither NEPA nor NFMA provides a private right of action, federal courts review claims that the FS violated these statutes under the APA.");* San Juan Citizens All. v. Norton, *586 F. Supp. 2d 1270, 1282 (D.N.M. 2008) ("The parties have assumed that the APA is the source of judicial review for all three statutes at issue in this case. However, there is conflicting authority over whether a direct right of action exists under NHPA."); contra* North Oakland Voters All. v.

Plaintiff filed a motion seeking a temporary restraining order ("TRO") enjoining defendants from continuing construction of the history center until the court rules on its motion for preliminary injunction. A hearing on the motion was held on May 27, 2016, at which plaintiff argued that defendants failed to comply with its obligations under NEPA and NHPA. Plaintiff also asserted that defendants had begun to pour the concrete floor for the history center and claimed that, once completed, the concrete would prevent it from being able to conduct the ground-penetrating radar tests required to determine whether any human remains, funerary objects or cultural items are located at the building site.

The court concluded at the end of the hearing that, due to the unusual circumstances presented by the case, a short TRO was warranted to maintain the status quo for a brief period. The parties were directed to file a statement regarding the status of the construction site, which they have done. Because the pouring of the floor has not been completed, it appears the testing plaintiff seeks to perform is still possible.

## Background[2]

The court will not detail the history of the ownership of the land on which the history center is being constructed. The property is held jointly in trust by the federal government for the Wichita Tribe, Caddo Nation and Delaware Nation ("WCD lands"), but a dispute exists regarding whether the Wichita Tribe has the right to the title to the property as the

---

City of Oakland, 1992 WL 367096, at *5 (N.D. Cal. Oct. 6, 1992) (private right of action exists to enforce NHPA).

[2]The facts, taken from the complaint, two declarations, and the parties' proffers at the TRO hearing are essentially undisputed. To the extent a fact is controverted, it will be noted.

result of resolutions passed by the three tribes. In 2007 the tribes passed identical resolutions partitioning 600 acres of jointly held lands into three parcels for the exclusive use of each individual tribe. *See* Doc. #1-3;[3] defendants' TRO hearing exhibits 2-4; 14-15. They sought recognition of the conveyances by the Bureau of Indian Affairs ("BIA") and the matter is still pending without final resolution by the agency. *See id.*, exhibit 15. The Caddo and Delaware Nations have since attempted to rescind their resolutions. The parties' submissions indicate that all three tribes have, to one degree or another, relied on the assumption that at least a de facto partition of the land has occurred. The court is not, however, being asked to resolve that controversy and it does not prevent it from determining the dispute before it.

After having constructed a travel plaza on land designated for it under the partition arrangement, *see* defendants' TRO hearing exhibits 6-7,[4] the Wichita Tribe decided there was "a need to establish a permanent location to preserve the history of the original inhabitants of Oklahoma, namely the Wichita and Affiliated Tribes." Doc. #1-1. The Department of Housing and Urban Development ("HUD") approved a grant for the Wichita Tribe to construct a 4000 square foot building for a museum as part of the Wichita Historical Center.

The Wichita Tribe's use of HUD funds to construct its history center triggered the procedural protections of the National Environmental Policy Act and the National Historic Preservation Act . 42 U.S.C. § 4332(2)(C) (NEPA's procedural protections apply to "major

---

[3]*Page references to briefs and exhibits are to the CM/ECF document and page number.*

[4]*The construction dates for the travel plaza are unknown, although the Environmental Assessment is dated June 7, 2012.*

Federal actions significantly affecting the quality of the human environment ...."); 54 U.S.C. § 306108 (NHPA's protection's apply to a "federally assisted undertaking in any State."). Pursuant to federal law, because of its acceptance of Community Development Block Grants funds from HUD, the tribe was allowed to "assume the responsibility for environmental review, decision-making, and action that would otherwise apply to HUD under NEPA and other provisions of law that further the purposes of NEPA, as specified in § 58.5 [including NHPA]."[5] 24 C.F.R. § 58.4; 42 U.S.C. § 5304(g); see North Oakland Voters All. v. City of Oakland, 1992 WL 367096, at *8 (N.D. Cal. Oct. 6, 1992). In conjunction with its construction of the travel plaza, the Wichita Tribe had similarly assumed statutory obligations under NEPA and NHPA, and the structure was built and has been operating apparently without any objections from plaintiff.

To comply with its duties under the federal acts, the Wichita Tribe sent identical letters dated January 9, 2015, to the Caddo Nation Tribal Historic Preservation Office,[6] the Delaware National Tribal Historic Preservation Office and the BIA Southern Plains Regional

---

[5]*This assumption of responsibility, pursuant to federal law and under which the Wichita Nation acts as a de facto government agency, provides a basis for the court to exercise jurisdiction over a sovereign Indian tribe. See North Oakland Voters All., 1992 WL 367096, at *9. However, the tribe also waived its sovereign tribal immunity in the Environmental Assessment. See Doc. #1-1, p. 11("The Wichita and Affiliated Tribes certifies to HUD that Terri Parton, in her capacity as President consents to accept the jurisdiction of the Federal Courts if an action is brought to enforce responsibilities in relation to the environmental review process and that these responsibilities have been satisfied.").*

[6]*The declarations attached to the complaint were prepared by the current and former Tribal Historic Preservation Officers("THPO") for the Caddo Nation. Neither held the position when the January 2015 letter was sent.*

Office advising them that HUD had approved a grant to fund the construction of the Wichita Historical Center, including "a single story 4000 S.F. building with concrete or asphalt parking spaces and roads." Defendants' TRO hearing exhibit 8; Complaint, ¶ 49. The letter included the project site and legal description of the property. It also stated:

> Please assist us in complying with the Federal Environment Review process by reviewing the project described and providing your comments of any potential impact on the environment within your jurisdiction. Your timely response will be appreciated."

*Id.* The Caddo Nation did not respond to the January 2015 letter. Doc. #1-3, pp. 3-4 & n.8. The Wichita Tribe then performed an Environmental Assessment ("EA") and subsequently certified to HUD that it had satisfied the environmental review process, which requires compliance with both NEPA and NHPA. Complaint, ¶53. It supported its determination in the EA that the project would not affect any historic properties, by attaching the letter from the state history preservation officer ("SHPO"), which "detail[ed] an investigation and survey of cultural resources undertaken by an archeologist, John D. Northcutt, completed on April 6, 2015 ("Northcutt Report").[7] Complaint, ¶57. Mr. Northcutt stated in his report that the lands where the Wichita Tribe sought to construct its history center contained an archeological site, 34CD-352, which included artifacts dating back to the 1800's and had "some potential to produce more artifacts that relate to an 1870's/1880's period Indian school important to Oklahoma's history." Complaint,¶59. While he also stated that the site was

---

[7]*The court does not have a copy of the report or copies of other documents that might be helpful at least in providing some background information. Because of the timing of the events, it also does not have the benefit of any briefing from defendants.*

5

"considered possibly eligible for the National Register if future excavations find significant artifacts below the surface," *id*. at ¶60, the Wichita Tribe decided "'not to fund further archeological investigation' at that time." *Id.*

On May 22, 2015, the Wichita Tribe published in the *Anadarko Daily News* the notice regarding its construction project, which stated its finding of no significant impact on the environment and its intent to request that the funds for the project be released. Any person or group which disagreed with the determination or wished to comment on the project was directed to submit written comments by June 12, 2015. Defendants' TRO exhibit 9. Plaintiff did not respond to the Notice.

On January 7, 2016, defendants sent the Caddo Nation Chairman and the Delaware President a letter stating that the Wichita Tribe had received a "grant to conduct an assessment of archaeological sites 34CD-352 and 34CD-353 to determine their eligibility for the National Register of Historic Places." Defendants' TRO exhibit 10. The property, the letter states, currently contains the Wichita Travel Plaza and will be the site of the soon to be built Wichita Museum and Cultural Center. *Id.* The letter also stated:

> The sites are thought to be associated with the original Riverside Indian School that was established in 1871 for Wichita, Caddo, and Delaware children. We have previously conducted a Phase I archaeological survey which was conducted by John Northcutt. Northcutt recommended that no further work was warranted at CD-353 but that CD-352 may be eligible for the national Register and should be avoided. The State Historic Preservation Office concurred and a 100 feet avoidance zone has been established around CD-352 to protect it from any ground disturbing, construction activities.
>
> The Tribe now proposes to do geophysical testing of both sites. The testing will be performed by the Oklahoma Archeological Survey and will consist of

6

gradiometry, electrical resistance, ground penetrating radar, and possibly hand-held magnetic susceptibility. If sub-surface features are detected, a plan will then be created to further assess the eligibility for the NRHP.[8] We will keep you informed of the outcomes each step of the way and seek your input on the nomination of the site(s) if the survey results justify a nomination. If you have any questions or comments please contact . . . .

Defendants' TRO exhibit 10. The Caddo Nation did not respond to the January 2016 letter. Doc. #1-3, pp. 3-4 & n.8. Plaintiff alleged in the complaint it never received the letter and was not made aware of its contents until leaders from the three tribes met on February 16, 2016, to discuss the construction. At the TRO hearing, where defendants offered undisputed evidence of plaintiff's receipt of the letter, defendants' TRO exhibit 10, plaintiff argued that when the letter arrived, the Caddo Tribe's leadership was in disarray.

On February 18, 2016, Caddo Nation officials met with defendants and informed them that Caddo elders had expressed concerns that defendants' construction will disturb and harm Caddo remains. The Caddo Nation Chairman also told President Parton that defendants had not sufficiently consulted with plaintiff as required by NHPA. Defendants responded that the January 9, 2015, letter satisfied the duty to consult. Plaintiff then sent a demand letter dated April 13, 2016, insisting that defendants cease construction of the history center until "adequate consultation" could take place as required by federal law.[9] Complaint, ¶74. Plaintiff stated in the letter that

---

[8]*National Register of Historic Places.*

[9]*In the letter the Caddo Nation stated that it "want[ed] to move forward in cooperative fashion with the Wichita Tribe and the Delaware Nation to achieve final partition of WCD lands." Doc. 1-2. However, it noted that its ability to do so would be affected by the Wichita Tribe's continued building on the "sensitive, jointly-held trust lands." Id.*

> Caddo Nation leaders have expressed their serious concerns with the Wichita Tribe's ongoing construction of a History Center on one parcel of the jointly held lands. Relying on the knowledge of their elders, Caddo Nation leaders consider the lands that the Wichita Tribe is turning to be a Caddo sacred site. The lands hold the remains of Caddo ancestors and their associated or unassociated funerary objects.

Doc. #1-2. The Wichita Tribe responded with a letter dated April 18, 2016, in which it states that it sent notices to the Caddo Nation "regarding the construction of the Wichita Travel Plaza, as well as the Wichita History Center (both of which are located on the same parcel of set aside lands), and the Caddo Nation declined to respond."[10] Doc. #1-3, pp. 3-4. The tribe noted that "[i]f the Caddo Nation wished to object to the construction of these projects, the time to do so was at the time notice was sent." *Id*. at p. 4. The letter then continues:

> The Wichita Tribe has been overly cautious to ensure that no sensitive sites will be affected by the construction and operation of these facilities, including having an extensive archeological study of this parcel conducted, engaging in consultation with the Oklahoma Archeological Survey and the Oklahoma Historical Center, and by noticing the Caddo and Delaware Nations of its intent to construct the facilities located on this particular parcel of land. There are no sites upon the land eligible for the National Register of Historic Places. Further, while under no obligation to do so as the construction project is not expected to disturb any remains or funerary objects, the Wichita Tribe has developed plans and procedures for the unanticipated discovery of cultural resources should any remains or funerary objects be found. This plan requires notice to the Caddo Nation in the unforeseen circumstance that the construction of the Wichita History Center—or any Wichita construction project—unearths sensitive cultural materials which may be related to the Caddo Nation.

---

[10]*The notices are letters sent to the Chairman of the Caddo Nation in May 2013 pertaining to the Travel Plaza, and in January 2016 to the Caddo Nation Tribal Historic Preservation Office and the Chairman of the Caddo Nation pertaining to the history center. See Doc. #1-3, p. 3 nn. 7-8.*

*Id.*

Leaders from the three tribes met on April 22, 2016. Plaintiff again expressed its concern that defendants' construction of the history center would result in the destruction of human remains and cultural artifacts. Defendants told plaintiff at the meeting that they would be pouring concrete for the history center in a few weeks. A few days later, on April 28, 2016, the Caddo Nation sent defendants a letter constituting its "Proposal to Address Possible Harm to Caddo Resources on Wichita, Caddo, and Delaware (WCD) Lands." Doc. #1-4. In it the Caddo Nation states:

> As stated at the meeting, Caddo oral history indicates that Caddo burials are located on the lower lands on or near the construction site. Years ago, Caddo remains were moved from the lower lands to higher land near the "Kiowa Cemetery" up the hill. Caddos refused to touch the remains, so non-Indians handled them. A non-Indian who handled the remains, who is married to a Caddo, has come forward to reaffirm this event. Caddo Nation officials are concerned that other Caddo graves were not moved and continue to be located in the construction area.
>
> Further, as stated at the meeting, the Wichita Tribe has indicated that construction has unearthed material from the former Riverside Indian Boarding School. Caddo Nation officials are concerned that the remains of children's graves from Riverside may be disturbed. As you know, in one of the tragedies of American history, the Indian children who were forcibly removed from their homes and sent to boarding schools sometimes died and were buried near the boarding schools. Caddo Nation officials would like assurances that steps will be taken to ensure that these graves, which could hold Caddo children as well as children of other Tribes, will not be disturbed.

*Id.* at p. 2.

The Caddo Tribe proposed to perform ground penetrating radar ("GPR") testing on the construction site at its own expense, which, according to the letter, it expected would take

9

about two weeks to complete.[11] It also proposed to hire and pay for archaeological experts to evaluate the property and provide site testing. The tribe was not satisfied with the archaeological studies that the Wichita Tribe had conducted; it was concerned with their scope and the fact that they were "not informed by Caddo Nation oral history and information." *Id.* at p. 3. This work, the tribe anticipated, would take about two weeks. Finally, the Caddo Nation proposed that it "be formally noticed if and when construction at the site unearths inadvertent discoveries of any items," *id.*, and that Caddo historic preservation and other cultural experts monitor the site.

In their response, dated May 6, 2016, rejecting plaintiff's proposal, the Wichita Tribe stated:

> As you will recall, at the meeting on April 22, 2016, we requested specific information regarding what locations within the 71-acre parcel were of concern to certain Caddo tribal members. Unfortunately, the letter we received does not include any additional information. For instance, we have not received information about what type of objects may be adversely affected other than some general speculation that there may be **possible** human remains, sacred objects, and/or sacred places. No specific information – such as statements from tribal members or non-tribal members with firsthand knowledge relating to this parcel, or even the names of such tribal members or non-tribal members – has been provided. Moreover, no specific locations within this parcel have been identified.

Defendants' TRO exhibit 13.

Defendants continued with their construction project and began pouring concrete

---

[11]*The Caddo Nation stated in its April 28, 2016, letter that it was waiting to hear back from the contractors it would engage to perform the work as to how long it would take. At the TRO hearing, plaintiff was still unable to provide a specific time estimate.*

which, when completed would make it difficult, if not impossible, to test for Caddo remains by GPR, at least under the actual building site. On May 25, 2016, the Caddo nation filed this action and its motion for a TRO.

Analysis

"To obtain a temporary restraining order], the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." Gen. Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007). While the court, like the Wichita Tribe, understands the concern with the potential presence of Caddo human remains, sacred objects or sacred places, it concludes the Caddo Tribe has not met its burden of establishing a substantial likelihood of success on the merits, even under the less strict standard that plaintiff urges is applicable.[12]

The Caddo Nation claims the Wichita Nation violated the notice and consideration of alternatives requirements of NEPA and the consultation requirement imposed by § 106 of

---

[12]*See Vill. of v. U.S. Dep't of Interior, 577 Fed. Appx. 760, 769 (10th Cir. 2014) ("Prior to the Supreme Court's decision in Winter [v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)], this court imposed two different tests depending on the circumstances of the case: in the run-of-the-mill case, we required a plaintiff to show a substantial likelihood of success on the merits, but if a plaintiff could establish that the other three preliminary injunction factors tip strongly in his or her favor, we said the plaintiff needed only to show questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation. There is now a question whether either test survived Winter, where the Court stated that to meet the merits prong, a plaintiff needed to show that he was 'likely to succeed on the merits,' 555 U.S. at 20") (internal quotation marks omitted). Plaintiff would not prevail even under the lesser Winter test.*

NHPA and its attendant regulations.

NEPA requires federal agencies to "assess potential environmental consequences of a proposed action" and prepare an environmental impact statement ("EIS"), an environmental assessment ("EA") or a categorical exclusion. Utah Envtl. Cong. v. Russell, 518 F.3d 817, 820-21 (10th Cir. 2008). An agency may prepare an EA if it is uncertain whether a proposed action will significantly affect the environment. *Id.* at 821. An EA is a "'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare' a more detailed EIS." *id.* (quoting 40 C.F.R. § 1508.9). If the agency determines, pursuant to the EA, that a more detailed EIS is not required, it issues a "finding of no significant impact (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* (internal quotation marks omitted). NEPA "requires only that the agency take a hard look at the environmental consequences before taking a major action. In other words, it prohibits uninformed-rather than unwise-agency action." Utah Shared Access All. v. U.S. Forest Serv., 288 F.3d 1205, 1207-08 (10th Cir. 2002) (internal quotation marks omitted). The court's role in reviewing compliance with the Act is "'is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" *Id.* at 1208 (quoting Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, 462 U.S. 87, 97-98 (1983)).

Plaintiff argues that the Wichita Tribe violated NEPA because it failed to "meaningfully consider and discuss alternatives in the process of reaching its decision." Doc.

#4, p. 8. It contends there was no attempt to comply with the duty to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. In the EA, the Wichita Tribe gave the following explanations as to why other sites were not considered or implemented:

> ALTERNATIVES TO THE PROPOSED ACTION
> At this time the Wichita and Affiliated Tribes has not been able to consider an alternative site because of the site which is limited in area for development due to the trees and the need to continue to develop the existing area to create a destination business site.
>
> No Action Alternative
> As stated above The Tribe has not considered an alternative site primarily because of the limited frontage property available in the area needed for business development.

Doc. #1-1, p. 9.

"NEPA does not require an agency to analyze 'the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective.'" Lee v. U.S. Air Force, 354 F.3d 1229, 1238 (10th Cir. 2004) (quoting All Indian Pueblo Council v. United States, 975 F.2d 1437, 1444 (10th Cir.1992)). The Wichita Nation offered a reasonable explanation as to why other locations for the history center were not feasible –the tribe had limited acreage to work with, trees to work around and the site was already partially developed. Plaintiff does not suggest alternative sites or even argue that the Wichita Tribe should have selected another location. Its concerns are not about the project's effects on the quality of the human environment. Rather the Caddo Nation is attempting to get injunctive relief based on what it describes as the Wichita Tribe's *prima facie* violation

13

of NEPA." Doc. #4, p. 8. That is not enough for plaintiff to meet its burden of demonstrating that the Wichita Tribe acted arbitrarily when it did not consider an alternative site for its history center. The "[d]iscussion [of alternatives] must be moored to some notion of feasibility." Lee, 354 F.3d at 1238 (internal quotation marks omitted). The Wichita Tribe satisfied its duty to consider alternatives under NEPA. *See id.* at 1237 ("We apply a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a [final] EIS are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment.") (internal quotation marks omitted); *see also* Vill. of Logan v. U.S. Dep't of Interior, 577 Fed. Appx. 760, 766-67 (10th Cir. 2014) ("NEPA presumption [arising from noncompliance with NEPA procedure] does not absolve a plaintiff from having to make a specific showing that the environmental harm results in irreparable injury to their specific environmental interests") (internal quotation marks omitted).

Plaintiff contends defendants also violated NEPA by failing to provide adequate notice of their 'finding of no significant impact' (FONSI). Plaintiff disputes that the May 22, 2015, publication in the *Anadarko Daily News* provided sufficient public notice. By publishing the FONSI in the Anadarko Daily News, a "newspaper of general circulation in the affected community," 24 C.F.R. § 58.43, defendants satisfied NEPA's notice requirements. Defendants apparently did not, though, send notice of the FONSI to plaintiff. *See id.* However, the Wichita Tribe attempted to involve the Caddo Nation in the "Federal Environment Review process." Defendants' TRO exhibit 8. Its January 9, 2015, letter

14

informing the Caddo Nation of HUD's approval of the grant which would fund the construction of the history center went unanswered. While the Wichita Tribe should have sent the FONSI to the Caddo and Delaware Nations,[13] plaintiff did not contend that the tribe was unaware of the construction project. It also does not argue that but for a lack of notice it would have objected to the project due to environmental concerns. *See* Vill. of Logan, 577 Fed. Appx. at 766-67. Plaintiff has not met its burden of showing that defendant acted arbitrarily in assessing the potential environmental consequences of its proposed building.

Under NHPA, federal agencies are prohibited from approving projects such as the history center, unless the agency takes into account the effects of the undertaking on historic properties. 54 U.S.C. § 306108. They must consult with state history preservation officers (SHPOs) and any potentially affected Indian tribes – through a process referred to as Section 106 consultation – to determine whether historic properties or traditional cultural properties exist in the area of the planned activity that might be adversely affected. Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 161, 166 (1st Cir. 2003); San Juan Citizens All. v. Norton, 586 F. Supp. 2d 1270, 1280-81 (D.N.M. 2008); 36 C.F.R. §§ 800.2(a)(4), (c)(2). If a tribe considers a site that might be affected by the project to have religious or cultural significance, it may become a consulting party. Narragansett Indian Tribe, 334 F.3d at 167. Such a consulting tribe is then entitled to: "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties,

---

[13]*It may have. As noted earlier, the court has not received any briefing from defendants and only limited evidence from the parties – that attached to pleadings and proffers at the TRO hearing.*

including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id*. (citing 36 C.F.R. § 800.2(c)(2)(ii)(A)).[14]

Here , despite the Caddo Nation's arguments to the contrary, the Wichita Tribe did consult with it, or make an effort to consult with it. The Caddo Nation did not respond to the Wichita Tribe's January 9, 2015, letter, in which it informed the Caddo Nation of the planned history center. The Caddo Nation was specifically asked to "assist [the Wichita Tribe] in complying with the Federal Environment Review process by reviewing the project described and providing your comments of any potential impact on the environment within your jurisdiction. Your timely response will be appreciated." Defendants' TRO exhibit 8.[15] A year later, by letter dated January 7, 2016, the Wichita Tribe advised the Caddo Nation that it proposed to have geophysical testing of archaeological sites 34CD-352 and 34CD-353 performed to determine their eligibility for the National Register of Historic Places. Again, the Caddo Nation did not respond. It was not until mid-February that the Caddo Nation informed the Wichita Tribe that Caddo elders had expressed concerns about defendants' construction remains. However, despite defendants' inquiries, the Caddo Tribe failed to provide specific information as to locations within the 71-acre parcel that "were of concern to certain Caddo tribal members" or names of tribal members or non-tribal members who

---

[14]Tribal consultation should be conducted concurrently with the NEPA analysis. See 36 C.F.R. § 800.8; San Juan Citizens All., 586 F.Supp.2d at 1281.

[15]The letter was sent to the Caddo Indian Tribe's Tribal Historic Preservation Office.

16

could provide such information. Defendants' TRO exhibit 13. Defendants indicate they requested that information at the parties' April 22, 2016, meeting, but it was not provided. *See* Doc. #1-4; Defendants' TRO exhibit 13. Instead what defendants received in return was

> Caddo oral history indicates that Caddo burials are located on the lower lands on or near the construction site. Years ago, Caddo remains were moved from the lower lands to higher land near the "Kiowa Cemetery" up the hill. Caddos refused to touch the remains, so non-Indians handled them. A non-Indian who handled the remains, who is married to a Caddo, has come forward to reaffirm this event. Caddo Nation officials are concerned that other Caddo graves were not moved and continue to be located in the construction area.
>
> Further, as stated at the meeting, the Wichita Tribe has indicated that construction has unearthed material from the former Riverside Indian Boarding School. Caddo Nation officials are concerned that the remains of children's graves from Riverside may be disturbed. As you know, in one of the tragedies of American history, the Indian children who were forcibly removed from their homes and sent to boarding schools sometimes died and were buried near the boarding schools. Caddo Nation officials would like assurances that steps will be taken to ensure that these graves, which could hold Caddo children as well as children of other Tribes, will not be disturbed.

Doc. #1-4, p. 2. As of the date of the TRO hearing, other than the declaration of Tamara Francis-Fourkiller, which was filed on May 25, 2016, no names or locations had been provided to defendants. And what she provided is insufficient and offered too late. Chairman Francis-Fourkiller states in her declaration:

> I believe there are gravesites at the location of the original Riverside Indian Boarding School, a school that was originally established for Wichita and Caddo children. Bodies may have been moved that were located at a cemetery in that same area to make way for a highway that was built, but not all of the bodies were moved. It is my belief that there are still gravesites located at the original Riverside Indian Boarding School. The Wichita Tribe is now in the process of constructing a History Center at the site of the original Riverside Indian Boarding School. I believe this site to be the location of Caddo remains and artifacts.

17

Doc. #5.[16]  This alone does not provide compelling evidence that there are Caddo remains or sacred objects at the construction site.

Plaintiff has not demonstrated that the Wichita Tribe failed to consult or acted arbitrarily in performing its responsibilities under NHPA.  See Narragansett Indian Tribe, 334 F.3d at 166-169.  While the Wichita Tribe may not have executed its Section 106 duties perfectly, the Caddo Nation was offered the opportunity to participate but did not take it. The problem apparently was due, not to a lack of notice but, as explained by Chairman Francis-Fourkiller, to the "Caddo Nation's political turmoil over the last two years when the Caddo did not have a Native American Graves Protection and Repatriation Act ("NAGPRA") Director or Preservation Officer to protect Caddo interests."  Doc. #5, pp. 6-7. *See generally* Vill. of Logan, 577 Fed. Appx. at 770 ("More simply, it matters not why Logan chose not to participate in the NEPA process; having consciously made that choice, Logan must now live with it.").

"Where no historic property has been identified, the Tribe has no basis under NHPA to demand particular actions by the Authority."  Narragansett Indian Tribe, 334 F.3d at 168. Nonetheless, the Wichita Tribe has agreed to implement "a NAGPRA 'unanticipated discovery plan' should any cultural resources or human remains be uncovered during

---

[16]*The other declarant, Kimberly Penrod, states that she has "documentation for specific burials on the side of the hill where the construction site is located," but does not provide the documentation.  She also states that the "Caddo Nation has informed the Wichita Tribe about concerns from elders and scholarly documentation that the site contains the remains of Caddoes and members of other Tribes" but neither identifies the elders nor provides the documentation.  Doc. #6.*

18

construction. If a cultural resource is found, work must stop and a 200-feet avoidance zone must be set up." Defendants' TRO exhibit 17. If human remains are found the plan outlines special procedures for their treatment and also requires that notice be sent to both the Delaware Nation and the Caddo Nation if any cultural resources or remains are unearthed. *Id.*

Based on the record before it, the court concludes that the Wichita Tribe fulfilled its consultation responsibilities under NHPA. Plaintiff did not meet its burden of showing a violation of the Act.

Having concluded that plaintiff failed to demonstrate it is likely to succeed on the merits of its claim that defendants violated the APA by their noncompliance with NEPA or NHPA, the court vacates the TRO previously entered and **DENIES** plaintiff's motion for TRO [Doc. #3].[17]

**IT IS SO ORDERED**.

Dated this 31st day of May, 2016.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE

---

[17]*Because plaintiff has failed to establish this factor, it is unnecessary for the court to consider the other three.*